Allen, J.
Upon the facts stated in the bill of exceptions, and certified by the court as all the facts proved at the trial, it seems to me, that the court erred in overruling the motion for a new trial. A gift of slaves, to be valid, must either be by deed or will properly proved and recorded, or else the possession must have passed from the donor to the donee, and remained with the donee or some person claiming under him.
*156 The first fact relied upon to establish the gift is, that in 1816 or 1817, Tutt the son, then a very young man, removed to a place in the same county, about fifteen miles from his father’s house, and opened a blacksmith’s shop, in which the slave Moses worked as a smith; the wife of the negro and one child were with him. They remained about a year, when the shop was broken up, and the negroes returned to the farm of Tutt the father. There was no evidence to shew the terms on which the son held the negroes during this period; the fact alone appeared, that they were in his possession, as stated. Would this proof, standing alone, justify the inference of a gift, and delivery of possession consummating it ? It does not strike me as being sufficient. It was remarked by judge Tucker in the case of Mahon v. Johnston, that “where the gift is without value received, it is but reasonable, that the party who is to be deprived of his property without an equivalent, should be clearly proved to have actually parted with it. This can never be done, where the evidence to establish the gift is altogether equivocal; and such is always the case with mere evidence of possession in a transaction between a father and a child,- such possession being equally consistent with the idea of a loan, or gift, and both loans and gifts, under such circumstances, being common, the fact of possession does not prove much.” These remarks seem to me to be sound, and that much mischief might ensue, if it were ever to be established that the mere possession by a child of a slave theretofore belonging to the father, should afford sufficient evidence of a gift. The act is equivocal of itself,- and unconnected with other circumstances it proves nothing ; it is every day’s practice for the parent to permit the child to hold possession of a slave for his accommodation, without intending to part with the property, or deprive himself of the power to dispose of it according to his own pleasure, when he comes to distribute his estate.
*157 The circumstances attending the transaction in this case, would rather lead to the inference of a loan than a gift. The son was a very young man, and unmarried. It does not appear, that he returned immediately to his father’s house on the breaking up of his shop; he crossed the mountains, it appeared, and lived some time there, and then returned to his father’s ; but whether this was before or after opening the shop did not distinctly appear. But, as it did appear he was very young when he opened the shop, the inference is strong, that it was on abandoning the business that he crossed the mountains. The whole seems to have been an experiment by a young man, in which the father aided him, probably with the intention of giving him the slaves, if it turned out successful; but there is nothing to warrant the inference of a gift at the time.
The slaves returned to the father’s plantation, which was large, and on which there were many slaves. The son also returned, and managed for the father. To all appearance, the slaves in question were as much the slaves of the father as the other slaves on the plantation. And in November 1827, the father executed two bonds to a creditor, in which the son joined as a surety; and on the same day, the father executed a deed of trust of the slaves in question, to indemnify the son against loss as his surety. The son afterwards told the trustee, that he hoped to borrow money to pay the debts, to have the slaves sold, and buy them himself. He did not, to the trustee, a near neighbour and friend, set up any claim to the slaves. If the father had executed a deed of trust on the slaves to secure the creditors, the circumstance might not have had much influence: the son, though asserting a claim, might have consented to the slaves being pledged to secure a debt for which he himself had become responsible. But that is not this case. The deed was given for his own indemnification. He could not then have asserted a claim to the negroes by virtue *158 of any supposed donation in 1816 or 1817; for he would, 7 . n i • m that case, have taken a deed of trust of his own property to secure himself. It is not expressly stated, that „ , .. . he knew of the deed ,• but he ivas then living Avith his father, and the deed is stated to bear date on the same day he became surety in the bonds. And whether apprized of the execution of the deed at the time or not, he kneAV of it afterwards ahd before the debt was satisfied, and expressed a hope of being able to borrow the money to pay the debts, and an intention to pinchase at the sale under the deed of trust. The execution of the deed of trust, and the conduct of the son in regard to it, are decisive against any right as growing out of the short possession held by him in 1816 or 1817. He must rely exclusively on the subsequent transactions.
Is there any fact certified, which proves, or from which the jury could fairly have inferred, a valid gift ? In 1830, an officer went to the house of the father to levy an execution against him to a large amount. The son observed, it should not be levied on the slaves belonging to him, but did not name the slaves. The father, hearing this, said there was enough of other property. Prior to 1830, all the slaves had been given in, to the commissioner of the revenue, in the father’s name, sometimes by the father, sometimes by the son: in that year, the father told the commissioner, that the property had theretofore been listed in his name, but it must now be separated, and “ the boys” must give in their oivn property. He did not, nor did any one else, say what was his,- or what belonged to “ the boysbut a change was made, and the son was charged with some slaves. A witness had frequently, for the last ten or twelve years before the trial, suggested to the father that a blacksmith would sell well, and asked whether he had such slave to sell, or suggested he might make such a sale ; to which the father replied he had none, but that the plaintiff had a blacksmith, a man Moses, and his family, *159 which he might sell if he pleased. These are all the facts bearing directly on the question of the gift after the deed of trust. And taking them most favourably for the son, it seems to me, we cannot construe them as amounting to a gift, without overturning the well settled principles of law. To the validity of such a gift, possession is essential. This possession should not be colourable, but real. The possession of the donor, in the words of judge Carr, in Durham, v. Dunkly, 6 Rand. 141. should be broken up. According to the facts of this case, there was, subsequent to the deed of trust, no such actual change of possession. To the world, the slaves continued in the situation they had remained in for years before. There was nothing to distinguish them from the other slaves on the father’s farm. The father still remained the visible owner. The possession remained unchanged. It is then unnecessary to enquire, whether, if there had been proof of a subsequent change of possession, the facts would establish a gift. For unless the donee has obtained possession, no proof of an intention to give, or of declarations that a gift had been made, would suffice.
It was argued, that as the jury and court below have, upon these facts, decided in favour of the plaintiff below, the deviation should be gross and palpable, before this court should interfere with the verdict: and Ross v. Overton, Brugh v. Shanks, and Mays v. Callison, arc cited. Ross v. Overton, the leading case on this subject, and referred to in all the subsequent cases as giving the rule, was decided before the case of Bennett v. Hardaway, in which this court established the rule, since rigidly adhered to, except in one or two instances not affecting the principle, that a bill of exceptions to a judgment overruling a motion for a new trial, ought not to state the evidence, but the facts appearing to the court to have been proved. The grounds upon which this rule was established are familiar. “ The appellate *160 court (it is said), sees the evidence on record only; and on paper the credit of every witness, not positively impeached, is the same.” The inferior court, “ while it r can fa^hfully transmit to this the actual words spoken py the witness, can give it no fac simile of the manner” of the witnesses. It is further stated to be an important principle, that the revising court should have the same lights, and act on the same data, as the court below; and that where this advantage is wanting in the appellate court, the judgment of the court below will preponderate. These remarks of judge Roane in Bennett v. Hardaway, are unanswerable, when confined to the subject to which he applied them. He was discussing the propriety of the appellate court’s reviewing the verdict and judgment of the trying court, upon the evidence as given before the jury. But I do not perceive their force, or the application of the principle laid down in Ross v. Overton, when the facts, and not the evidence, are certified. And I incline to think they were relied on in the case of Brugh v. Shanks, and other cases since the case of Bennett v. Hardaway, without sufficiently adverting to the change which that case has made. Thus, judge Carr, in Brugh v. Shanks, after quoting the decision in Ross v. Overton, observes, “ These remarks are applied to the court which presides at the trial, and has all the advantages (possessed by the jury) of seeing and hearing the witnesses: how much more strongly do they apply to the appellate court, deprived of these all important aids in'eviscerating truth?” But when the facts are certified, this court has nothing to do with the credit of the witnesses. The truth has been eviscerated for it. The appellate court acts upon an admitted state of facts; it takes them as the conceded facts, upon which the court and jury have proceeded; and so taking them, what is to prevent it from arriving at a correct conclusion ? Having all the 'facts, the question is, whether the court and jury drew a correct conclusion from them ? *161 And what better opportunity is possessed by the court . . and jury, than the revising court ? Their opportunities of deciding whether facts are or are not established by , . _ . . . the evidence, are certainly far superior. Hut having advanced that far, and arrived at the facts, the conclusion of law upon the facts may as well be drawn by the revising as the inferior coiu’t. This, it seems to me, is the fair construction of the case of Bennett v. Hardaway. The important principle is, that the revising court should have the same lights, and act upon the same data, as the inferior court. And therefore judge Roane held it improper to set out the evidence in the bill of exceptions. But when the facts are stated, he observes, “the appellate court does not in that case depart from or overrule the decision of the trying court, as to the weight of testimony, or the credit due to any witness. It only acts upon his own certificate and acknowledgment of his opinion upon the subject.” A bill of exceptions setting out the facts, he observes, “ briefly states them, as they appeared to the judge, and are admitted by him to have been proved; and, in consequence of such his admission, the appellate court founds its decision upon the same facts as those which governed the court below.” If the appellate court has the same lights and proceeds upon the same data, as the jury and the trying court, there would seem to be no sufficient reason why it should not draw its own conclusions, uninfluenced by the judgment and verdict.
A different practice is calculated to do injustice. The exceptor is compelled to take the certificate of facts from the tribunal which has pronounced against him. With every disposition to do equal justice, it is the natural tendency of the human mind to give prominence, and sometimes imperceptibly to attach undue importance, to evidence which has influenced its own decision. And if, upon the facts so certified, the party is to be met in the appellate court with every presumption against him, *162 the right to appeal from the decision overruling the motion for a new trial, becomes but a mockery.
This view is supported by the decision of this court Qarr;ngfon Y. Bennett. That was an action on a bond, to which the defence of gaming was set up. A doubt arose whether the bill of exceptions set out the evidence, or the facts proved; a majority of the court considered it as setting out the facts proved. There was no direct proof that the bond was given on a gaming consideration. And judge Carr, after citing Bennett v. Hardaway, said, “ that the appellate court must act on the facts stated, as upon a special verdict, and is to infer or imply nothing:” that the evidence went strongly to shew that the bond was for a gaming debt; but that the jury had said otherwise, and the court agreed with them; that they both heard the witness, and their decision must have been governed by the credit given to him. The other judges differed. Judge Green observed, that “ in a case where there was no direct evidence to prove the fact in issue, but only proof of other facts from which the matter in issue might or might not be inferred; if the court, instead of stating the proved facts, from which such an inference might arise, were required to state its own inference, this would be, not to state the fact or facts proved, but the judgment of the court as to their effect ,• and there would be nothing for the appellate court to decide upon. Yet the jury and the court below may err as essentially, and as fatally to the rights of the parties, in their inferences of other facts from the admitted facts, as in respect to the law arising from the facts proved.” The opinion of judge Coalter was to the same effect. And the court in that case, from the proved facts, inferred the fact that the bond was. given for the gaming debt, contrary to the finding of the jury and the judgment of the trying court: thereby, in effect, determining, that with the facts before it, it must pronounce its own judgment *163 upon them; that having the same lights it must deduce its own inferences. If the facts proved did not establish the fact necessary to a just conclusion, but such further fact was to be inferred from the facts proved, and those facts left it entirely uncertain whether the further fact could fairly be inferred; there, I think, respect should be paid to the verdict and judgment of the trying court, because a fair presumption might arise, that the fact necessary to warrant or repel the inference, had been omitted in the certificate of facts; and because that should be held as rightly determined which the facts did not shew to be wrong.
I am of opinion, that upon the facts stated, we have all the power and authority of the jury and court below, and that the facts stated do not warrant the verdict in this case. I think the judgment should be reversed and a new trial awarded.
Cabell and Brooke, J. concurred.